Kevin SCHUMACHER and
Toni Schumacher

v.

James D. COOPER, III.

Civ. A. No. 2:91–3436–18.

United States District Court,
D. South Carolina,
Charleston Division.

April 19, 1994.

Mark Tanenbaum, Charleston, SC, for plaintiff.

Edward Pritchard, Charleston, SC, for defendant.

## *ORDER*

NORTON, District Judge.

### *I. INTRODUCTION*

Plaintiffs, Kevin and Toni Schumacher, bring this admiralty action, pursuant to Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff Kevin Schumacher, while attending a 4th of July celebration on Lake Marion, was struck and injured by a pontoon boat owned and being operated by Defendant, James D. Cooper, III. Plaintiffs allege that Defendant was negligent and reckless in the operation of his boat and that he violated the Inland Rules of Navigation.

This case was tried before this Tribunal, sitting without a jury, on December 13 and

14, 1993. Having considered the testimony and the exhibits admitted at trial and the pre-trial and post-trial briefs submitted to the Court by the parties, this Court now makes the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

1. On July 4, 1991, Plaintiff Kevin Schumacher ("Plaintiff"), attended a July 4th party at Lake Marion, South Carolina, such being part of the navigable waters of the United States.

2. Plaintiff went to an area referred to as the beach near Mill Creek Landing, where people can play and swim. This area is a cove with cliffs or bluffs on each side and a log floating in the water.

3. This was the first time that Plaintiff Kevin Schumacher had been to Mill Creek Landing.

4. During the course of the day, there were as many as 50 men, women, and children at an informal beach "party," most of whom were swimming and playing in the water at various times.

5. There were also boats passing this area in a nearby channel of the lake and other boats that were entering and leaving the cove area for periods of time. There was also a house boat anchored just outside of the cove in the channel area.

6. Defendant James D. Cooper, III testified that at the time of the incident he was the owner of a twenty-eight foot Sanpan Pontoon Boat, equipped with a ninety horsepower Johnson outboard motor, which he was operating on Lake Marion in conjunction with the July 4th celebration.

7. Defendant had purchased this boat in the spring of 1990. He had owned other boats, but this boat was the first of its size and the first pontoon boat he had owned.

8. Henry N. Helgesen, Captain, U.S. Coast Guard (Retired) was called by Plaintiff as an expert in the field of safe operation of a vessel. Captain Helgesen began studying the navigational rules at age 17 and graduated from the Merchant Marine Academy in 1945. He then served in the U.S. Coast Guard mainly in a safety and regulatory capacity until 1982, enforcing the rules and regulations of navigation and marine safety. Captain Helgesen has been a consultant in marine safety and regulations since his retirement from the U.S. Coast Guard.

9. Captain Helgesen testified, and I so find, that there were a number of obstructions on the boat which hindered Defendant's sight and ability to keep a proper lookout. These included the sofas located on the boat, the tubular railing with the three-foot solid aluminum panel around the boat, a ladder to the sun deck, and a depth finder or fish finder. Captain Helgesen personally inspected the boat in a re-enactment conducted by Defendant and viewed a video re-enactment made by Defendant of the incident. The Court personally inspected the boat at the conclusion of the trial.

10. Captain Helgesen testified, and I so find, that when the driver is seated there is a blind spot from the driver's seat forward over the bow, measuring sixty feet from the operator's seat or forty feet beyond the bow. The driver's seat is twenty feet astern of the bow.

11. Defendant arrived at the beach with his boat shortly before 10:00 a.m.

12. Plaintiff and most of the other people in the area were swimming and playing in the water throughout the course of the day. Most, if not all, of the adults, including Plaintiff and Defendant, were drinking alcoholic beverages.

13. Shortly after Plaintiff arrived, Defendant took his boat out for the second ride of the day. Plaintiff accompanied Defendant on the boat to purchase gas for the boat and more beer for the party participants.

14. In the early afternoon, Defendant decided to go for a third boat ride.

15. There were numerous swimmers in the immediate area of the beach. Defendant testified that he knew he needed to keep a lookout for kids, swimmers, logs, and boats. He further testified that Plaintiff appeared to be very intoxicated, that he was stumbling, and that his speech was slurred the entire time Plaintiff was at the beach.

16. Defendant testified that although he knew that from where he sat to operate the boat he could not see in forward of the bow for a substantial distance, he did not request any of his passengers to assist him by keeping a forward lookout on this third trip of the day.

17. Defendant testified, and I so find, that as he backed from the shore he focused his attention towards the rear of the boat and only glanced around in other directions until he put the boat in forward gear. Only then did he begin to look forward.

18. Plaintiff testified, and I so find, that after Defendant's boat was approximately 10–15 feet from the shore, he began swimming towards the log. He then decided that he wanted to go on the boat with the others and began to swim directly towards the bow of the boat intending to climb aboard. Just as he reached the boat, Defendant put it in gear and began to move forward. Unfortunately Defendant could not see Plaintiff because Plaintiff was in Defendant's forty foot blind spot. Plaintiff was unable to climb aboard and became trapped underneath the boat. In an effort to avoid injury, he caught one of the C-bars underneath and tried to make his way to the front of the boat so as to climb aboard and out of harm's way.

19. As the boat accelerated, Plaintiff was unable to hold on. He tried to dive away from the boat, but the propeller hit him, leaving Plaintiff with a mangled leg and back.

20. Plaintiff further testified, and I so find, that when Defendant put the boat in forward gear, Plaintiff realized he was trapped under the boat and in danger and he tried to get Defendant's attention by yelling.

21. Defendant testified, as did Christine Altman, a passenger on the boat on this trip, that, because of the noise of the engine and the blaring of Defendant's stereo system, neither of them heard Plaintiff yell.

22. Plaintiff and William Goodman, an eyewitness and friend of Defendant's, both testified that Plaintiff was swimming on top of the water, in a free-style manner, when he approached the boat, and that he was easily visible. Mr. Goodman further testified that the log was 20 yards (sixty feet) from the boat when Plaintiff began to swim towards it and there were other swimmers around the log. From this, it must be concluded that Plaintiff was visible to the seated Defendant for at least twenty feet before he moved into Defendant's blind spot. In the video re-enactment, the swimmer representing Plaintiff can be seen swimming from the log towards the bow of the boat before disappearing into the seated operator's blind spot. If Defendant had posted a forward lookout, Plaintiff could have been seen during the entire sixty-foot distance.

23. Mr. Goodman, who was standing in the water, testified that when he realized Defendant did not see Plaintiff, he began waving his arms and yelling in an effort to warn Defendant and the passengers of the impending catastrophe. His efforts were to no avail because Mr. Goodman nor Plaintiff could be heard by anyone on Defendant's boat because the radio was blasting the cacophonous rhythms of rock and roll.

24. Christine Altman, the passenger, saw Mr. Goodman waving his arms, but could not hear him and did not know why he was waving at the boat.

25. Captain Helgesen testified that because Defendant remained seated he was unable to keep a proper lookout in front of the vessel. When Defendant did look forward, he was unable to see for forty feet in front of the vessel.

26. Captain Helgesen further opined that one would not always need a bow lookout in this boat but that under the circumstances prevailing at the time of this incident a bow lookout was necessary. Given the number of other boats, the children and adults swimming in the area, and the other distractions, a separate bow lookout was necessary before starting forward. Captain Helgesen testified that a seated operator could not have maintained a satisfactory lookout by sight because of the possibility that someone could have been in the water within the blind spot.

27. In the re-enactment video and on a re-enactment trip, Defendant played the radio at the volume at which it had been set at the time of the injury. Based on these re-enactments, Captain Helgesen testified that

Defendant was unable to hear people calling out because the stereo was blaring loud music, which overpowered any other sounds, including that of the engine. For these reasons, neither Plaintiff's nor Mr. Goodman's cries for help were heard.

28. Both Plaintiff and Defendant had been drinking on the day of the accident. Plaintiff's blood alcohol level was drawn by the Medical University of South Carolina (MUSC) on the evening of July 4, 1991 and was found to be 0.18%. Additionally, traces of cocaine were found in Plaintiff's urine. It is excruciatingly clear that Plaintiff was highly intoxicated at the time of his accident. Plaintiff admitted drinking six to seven beers and snorting three to four lines of cocaine on the night of July 3 and into the early morning hours of July 4. He further admitted that he went to sleep at 3:30 a.m. and got up at 7:00 a.m., that he started drinking beer again at 7:30 a.m., and that he continued to drink until the time of his accident. Every witness who testified at the trial, including Plaintiff, testified that Plaintiff was grossly intoxicated on the morning of July 4. This Court finds, based on the expert opinion of Dr. Richard Gadsden, that Plaintiff's blood alcohol level was at least 211 mg/dl and could have been as much as 300 mg/dl at the time of the accident.

29. On the other hand, although Defendant admitted drinking two to four beers during the morning and early afternoon of July 4, there is not enough evidence to conclude that Defendant was intoxicated at the time of the accident. Plaintiff testified that Defendant was not intoxicated at the time that Plaintiff rode with Defendant on the boat, Defendant denied being intoxicated, and both Ms. Altman and Mr. Goodman testified that Defendant was not intoxicated prior to the accident. This Court therefore concludes that Defendant was not intoxicated at the time of the accident.

30. Plaintiff Kevin Schumacher was swimming in an area where he had a right to be. It was only a short swim from the shore to the log or the boat and there had been other swimmers at the log. The log was only sixty feet from the boat, according to Mr. Goodman. The possibility of items floating in the water or even someone swimming are all foreseeable situations under the facts of this case. Defendant admitted that he knew he had to be on the lookout for "kids, swimmers, logs, and boats."

31. Plaintiff, however, wants this Court to absolve him from his own responsibility for his actions on the day in question. This the Court cannot and will not do. Plaintiff was grossly intoxicated at the time of his accident; his judgment was clearly affected by his drinking. Although he may have had the right to swim in the area in which he was swimming, Plaintiff had been on Defendant's boat earlier that morning; thus he knew or should have known that there was a blind spot in which the operator could not see objects floating in the water. Plaintiff also admitted on cross examination that he did not try to attract attention by waving or yelling to the boat before he swam under it. It was clearly negligent of Plaintiff to swim up under the boat. The cautious and prudent course of action would have been to swim to the outside of one of the pontoons. This Plaintiff failed to do, most probably as the result of his intoxicated condition.

32. Plaintiff was severely injured. He had a series of deep lacerations from the boat propeller running from his right shoulder down across his back to his left leg; his lacerations went through the skin and subcutaneous tissue in some areas, particularly the buttocks and leg. He also had a left ankle fracture and a chip in and break of his left distal tibia. In addition, his left posterior tibial nerve was severely damaged.

33. Orangeburg County EMS was called to the scene and treated Plaintiff. He was transported to MUSC by Meducare helicopter.

34. Plaintiff was admitted to MUSC upon arrival and underwent numerous surgeries to irrigate and debride his wounds.

35. Plaintiff remained as a patient at MUSC until July 19, 1991. During this time, July 4 through July 19, he received extensive physical therapy, radiology, and plastic surgery treatments.

36. Plaintiff suffered deep lacerations to his back, torso, and left lower leg. The

lacerations to his back and torso healed with scarring. The left leg, however, suffered tibial nerve damage, an open medial malleolar fracture, and a talus fracture.

37. Plaintiff's follow-up care was provided by Drs. R.M. Morwessel, Steven A. Siciliano, Richard C. Hagerty, and John A. McFadden, II. During this time, Plaintiff suffered from infected callus formations, due to walking on the lateral edge of his fifth metatarsal, blisters, foot drop, loss of sensation in his foot, and extreme pain in his left lower leg.

38. Plaintiff underwent another surgical procedure on February 25, 1993 to lengthen the left achilles tendon, the left posterior tibial tendon, and a cable sural nerve graft to the tibial nerve. According to stipulated medical testimony, the nerve repair surgery was only minimally successful. Plaintiff's flexion, inversion, and eversion of his foot and ankle are still severely limited due to the tethering effect of the soft tissue and tendon injuries. He has no feeling in the sole of his left foot, only slight protective sensation, and pain over the callus on his little toe. The medical evidence also showed that even following this surgery, Plaintiff had no active flexion of his toes.

39. Plaintiff now suffers from post-traumatic arthritis of the left ankle as well as lack of sensation and movement in the left lower extremity. These conditions are permanent and adversely effect his physical abilities. According to Dr. R.M. Morwessel, in an eight hour work day, Plaintiff should only be able to walk three hours and stand six hours.[1] He is unable to operate machinery with foot controls. He cannot be exposed to unprotected heights and can only occasionally climb ladders or be on scaffolding.

40. Plaintiff was subsequently seen by Dr. Howard L. Brilliant and Dr. Dowse D. Rustin, both orthopedic surgeons, for evaluations.

41. Dr. Brilliant saw Plaintiff August 16, 1993 and opined that Plaintiff was still having problems with his lower extremity, in that he had problems walking, had a persistent painful callus on his left foot, and had trouble being on his feet for any length of time. He further opined Plaintiff had a limp, a limitation of motion of his left ankle compared to his right with approximately forty to fifty percent loss of flexion and extension, and a painful callus over the fifth metatarsal head on the left. He also had no feeling on the bottom of his foot in the area of the posterior tibial nerve distribution. He further stated that, while it was difficult to evaluate the intrinsic function of his left foot, it appeared to be absent. He noted Plaintiff's painful healed lacerations with skin grafts, atrophy of his left leg compared to his right, and the scars on his back. X-rays of his foot showed early osteoarthritic changes in his ankle and multiple skin clips in place in the subcutaneous tissues.

In addition to the multiple lacerations of the left lower extremity, Dr. Brilliant diagnosed Plaintiff as having flexion contracture of the Achilles tendon, posterior tibial nerve laceration, and chronic callus of the left foot. He recommended that Plaintiff have bone removed from his fifth metatarsal to ease the callus formation on that foot and stated Plaintiff would be limited in his ability to do any sort of strenuous work activities. Based on Dr. Brilliant's review of Plaintiff's records, his physical exam and Plaintiff's x-ray findings, Dr. Brilliant opined that the functional loss of his left lower extremity was approximately fifty to sixty percent.

In his Physical Capacities Evaluation, Dr. Brilliant found that Plaintiff should never lift from the floor or from a table any weight in excess of twenty pounds. He further found Plaintiff should never carry any weight in excess of twenty pounds. He testified that Plaintiff should never climb a ladder, bend or squat in an unsupported fashion, kneel, be on scaffolding, or crawl. Further, Dr. Brilliant found that Plaintiff should never be exposed to working conditions involving unprotected heights and moving machinery. In addition,

---

1. The Court realizes that it is highly unlikely that anyone can walk and/or stand for nine hours in an eight-hour day, but that is Dr. Morwessel's testimony and therefore must be accepted by the Court. There are, of course, apocryphal stories that attorneys (particularly defense attorneys) can bill nine hours in an eight-hour day, but this ability is generally limited to this sector of the work force.

he would never be able to return to work in a full duty capacity.

42. On August 12, 1993, Dr. Dowse D. Rustin, orthopaedic surgeon, examined Plaintiff for evaluation of his injuries. Dr. Rustin found Plaintiff had a limited range of motion of the ankle and foot and of the toes of the left foot, including the great toe. He also had decreased sensation on the sole of the foot, and along the dorsolateral aspect of the right foot secondary to removal of the sural nerve for cable grafting.

Based on the limited range of motion of the ankle secondary to the tethering effect of the soft tissue and tendon injuries, Dr. Rustin opined that Plaintiff had a total of eighteen percent impairment of the ankle based on limited range of motion. He noted a total of thirty-six percent impairment of the left lower extremity and felt Plaintiff would certainly have abnormal function of his leg from this point forward, with varicosities, callus formation and probably atrophic ulcerations a risk for him for the rest of his life. He rated Plaintiff at a total of forty percent impairment of the left lower extremity, which is inclusive of the probability of future problems and limited range of motion of his toes, as well as the sural graft taken from the right lower extremity. He found Plaintiff had reached maximum improvement at this time and would probably require some intermittent treatment of the callus with change of shoes, padding and possible paring or removal of some of the underlying bone at some point in the future.

43. Plaintiff has incurred substantial medical expenses. His in-patient bill for the first MUSC stay was $34,397.00. The bill for the second stay for surgery was $7,001.00. The charge from University Medical Associates for his surgical care was $17,625.00. Plaintiff incurred various other charges at MUSC for office visits, supplies, therapy, x-rays, and social work. Plaintiff also incurred a bill for medical equipment from American Home Health. His total medical bills to date were stipulated to be $62,371.50.

44. According to Plaintiff and his wife, Toni, he suffers everyday from constant pain and numbness in his foot and leg. He walks with a limp when he tires, resulting in strain on his right leg and hip. He is unable to perform many tasks around his home. He no longer does repairs or maintenance on his home. He is unable to perform yard work. He is unable to run, play ball, or engage in any physical activities with his children because of his injury.

45. Plaintiff Toni Schumacher testified that she stayed with her husband while he was in the hospital 24 hours a day. When he was released from the hospital, she was his primary caretaker, as he was unable to move about on his own. She bathed him, dressed him, and cleaned his wounds two to three times every day until he returned to work. Plaintiff Toni Schumacher performed the same nursing services for her husband after the February 1993 surgery. He was in a cast up to his hip and was unable to walk. As a result of this surgery, he missed an additional eight weeks of work.

46. Plaintiffs both testified that due to the financial strain resulting from Kevin Schumacher's injuries, they lost a mobile home that they had just purchased, all of their furniture, and their car.

47. Plaintiffs testified that, prior to this accident, they enjoyed dancing, cookouts, and going out to eat as recreational activities. Since his injury, Plaintiff has been unable to participate in those activities. Plaintiff and his wife both testified that the only real activity Plaintiff has is work. He goes to work, and afterwards his leg and foot are really too painful for any recreational activities. After work, he soaks in a tub or hot shower and then rests his foot and leg.

48. Plaintiff was born on September 12, 1967 and was 24 years old at the time of the injury.

49. At the time of the incident, Plaintiff was employed by Industrial Acoustics and continues to be employed by Industrial Acoustics. Skip Bunch, Assistant Plant Superintendent for Industrial Acoustics, testified that various special accommodations have been made for Plaintiff because of Mr. Bunch's friendship with Plaintiff's father-in-law, Larry Phillips. Industrial Acoustics does not make him climb or lift heavy items. He is given a helper, and even with the

helper he is able to perform only sixty percent of the work he performed prior to the injury. Furthermore, Industrial Acoustics moved Plaintiff to second shift so that the work would be lighter.

Mr. Bunch testified that Plaintiff could not be a supervisor because of his limitations: he cannot climb to check on the work, he has limited ability to get around, and he is restricted in his ability to lift. Finally, Mr. Bunch testified that if Plaintiff were to apply to Industrial Acoustics for a job now, with his limitations, he would not be hired.

50. Based on a review of Plaintiff's medicals, test results, and interviews, Charles J. Vander Kolk, Ph.D, a licensed psychologist and certified rehabilitation counselor, testified that in his opinion Plaintiff would be unable to return to his chosen profession as a carpenter or any construction work and was thus relegated to lighter work.

Dr. Vander Kolk further testified that based on Dr. Morwessel's limitations, Plaintiff could not carry out the duties of a carpenter or a fitter, even though he was still classified as a fitter by his current employer.

He further testified that the South Carolina Employment Security Commission's survey of wages for carpenters ranged from $12.18 per hour to $16.88 per hour with $16.88 being the pay for a foreman or supervisor. He then opined that, but for the injury, Plaintiff would have returned to carpentry by July of 1992 and his earning capacity in carpentry in South Carolina during 1992 would have been between $12.18 to $16.88 per hour.

51. Plaintiff testified that he was unable to work from the time of the incident until October 14, 1991. The lost wages for this time period were $3,640.00. He also missed eight weeks in February and March of 1993 and the lost wages for this time period were $2,080.00. The total amount of pre-trial wages lost due to medical treatment and hospitalization was $5,720.00. At the time of the incident, Plaintiff's gross pay per week was $260.00.

52. Dr. Oliver G. Wood, Jr. prepared a written report regarding the economic loss of Plaintiff. The admissibility of this report was stipulated to by Defendant.

53. Dr. Wood's figures and calculations regarding Plaintiff's wage loss were based on Plaintiff's age at the time of the injury, 24.81 years, and his life expectancy of an additional 47.84 years according to S.C.Code Ann. § 19–1–150 (Law.Co-op.1985). Plaintiff was in excellent health prior to the injury and intended to work until age 67.

Dr. Wood also relied on Dr. Vander Kolk's opinion that Plaintiff had worked as a carpenter, intended to return to carpentry work, and that carpentry was Plaintiff's highest and best economic status. Dr. Wood then calculated Plaintiff's before-injury earning capacity as a carpenter based on a range from $12.18 per hour to $16.88 per hour. He calculated the after-injury earning capacity at $7.35 per hour for 3 to 5 years (Plaintiff's current wage rate) and $8.06 per hour, in 1992 dollars, thereafter through his work life expectancy.

54. Dr. Wood opined that Plaintiff had a net after trial loss in earning capacity of $236,328.00. His before trial loss after returning to work due to the diminution in earning capacity was $3,640.00 for a total loss in earning capacity of $239,968.00. Due to Plaintiff's inability to perform personal services around his home, he suffered an additional economic loss. He had a before trial loss of personal services in the amount of $3,988.00 and after trial loss of $59,879.00. The value of personal services is appraised at $5.00 per hour. The total loss of personal services was $63,867.00. Dr. Wood found that Plaintiff's total financial loss was $303,835.00 in addition to the $5,720.00 lost due to time out for medical treatment. All after trial losses have been discounted to present day value as of the date of trial.

55. The Court finds that Plaintiff has experienced tremendous past pain and suffering and will experience pain and suffering for the rest of his life, as supported by the testimony of Plaintiffs. Plaintiffs have also testified regarding Kevin Schumacher's loss of enjoyment of life. He no longer participates in the family activities. He is unable to play with his children, nor does he partici-

pate in cookouts, going to restaurants, or dancing.

56. Further, he has testified regarding household tasks which he is no longer able to perform. He no longer performs home maintenance, yard work, or any other service around his home.

57. Plaintiff has significant permanent impairment as a result of the injury. He has severely limited range of motion in his foot and ankle. He has virtually no feeling in the sole of his foot due to the nerve injury and resulting grafts. He has also developed traumatic arthritis and will most likely require additional medical care.

Plaintiff's leg is grossly disfigured as shown through photographs of the leg. Approximately two thirds of his calf is missing. He has scars on his left leg as a result of grafts. A large part of his left thigh was cut out by the propeller. He also has a series of large scars across his back.

58. I also find that Plaintiff Toni Schumacher has suffered a loss of her husband's aid, society, companionship, and counsel since the accident.

### III. CONCLUSIONS OF LAW

This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

The accident in this case occurred on Lake Marion, part of the Santee–Cooper Lakes. Vessels operating on this lake are subject to general maritime laws and the Inland Navigational Rules, 33 U.S.C.A. §§ 2001–2073 (West 1986).

Personal injury negligence actions arising from a collision between a pleasure boat and a swimmer on a lake in South Carolina are within the admiralty jurisdiction of this court. *Oliver v. Hardesty,* 745 F.2d 317 (4th Cir.1984); *see also Hogan v. Overman,* 767 F.2d 1093 (4th Cir.1985) (admiralty jurisdiction was invoked where alleged negligent operation of pleasure boat caused water skier to be thrown and injured). Because Plaintiff was swimming in Lake Marion, which constitutes navigable waters of the United States, when Defendant's pontoon boat struck and injured him, this action is within the admiralty jurisdiction of this Court.

Cases involving a tort committed on navigable water, whether brought under federal admiralty jurisdiction, in state court under the saving-to-suitors clause, or in federal court under diversity jurisdiction, are governed by admiralty law. *Byrd v. Byrd,* 657 F.2d 615, 617 (4th Cir.1981). If there is no admiralty rule on point, admiralty law looks to state law, either statutory or decisional, to supply the rule of decision. *Byrd,* 657 F.2d at 617. This rule is especially true in negligence causes of action. *S.C. Loveland, Inc. v. East West Towing, Inc.,* 608 F.2d 160 (5th Cir.1979), *cert. denied sub nom, St. Paul Mercury Ins. Co. v. East West Towing, Inc.,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

### A. Defendant's Liability to Plaintiff Kevin Schumacher

To recover for his injuries, Plaintiff must prove that Defendant was negligent in the operation of his boat. The elements of negligence that must be established are a duty, a breach of that duty, proximate cause, and resulting injury. *Shipes v. Piggly Wiggly St. Andrews, Inc.,* 269 S.C. 479, 238 S.E.2d 167 (1977).

#### 1. Duty

The owner of a vessel traversing in navigable waters has a duty to maintain a proper lookout by sight and by hearing. This duty stems from general concepts of prudent seamanship as well as from the statutory rules governing the navigation of vessels.

##### a. The duty to maintain a look-out under general seamanship principles

Prior to the enactment of statutory navigational rules, the United States Court of Appeals for the Fourth Circuit recognized the need for the operator of a boat to maintain a proper lookout by sight. In *Anthony v. International Paper Co.,* 289 F.2d 574 (4th Cir.1961), the court stated:

[I]n numerous cases it has been held that a vessel in motion in a traveled area should have a lookout at the location on the vessel, usually in the bow, best suited to see and hear an approaching object and that the lookout should have not other duties, particularly such as those which devolve upon the pilot or others on the bridge. Examination of these decisions, however, reveals that these rules have been laid down with respect to vessels of considerable size whose navigators are usually occupied with the performance of various other exacting duties, and so it is generally held than an arbitrary rule cannot be applied to every case and that the question of the sufficiency of the lookout in any instance is one of facts to be realistically resolved under the attendant circumstances, bearing in mind that the performance of lookout duty is an inexorable requirement of prudent navigation.... [T]he size of the vessel and the opportunity of the navigator to have a full view of the sea should be taken into consideration in determining the need for a separate and independent lookout.

*Anthony,* 289 F.2d at 580–81.

The Seventh Circuit in the case of *Rautbord v. Ehmann,* 190 F.2d 533 (7th Cir.1951), also addressed the duty to maintain a proper lookout.

While the boat was thus being operated, the claimant, Henry E. Ehmann, Jr., a minor of about the age of 16 years, walked into the river at a point known as Shalimar Subdivision. At that point there was a pier which projected ten or twelve yards into the river, and when claimant was in the river twenty or twenty-five yards beyond the pier he saw the boat coming toward him when it was twenty-five yards away. At that time, claimant dived under the water, evidently in an attempt to avoid being struck. The operator of the boat, so he testified, did not see the claimant at any time until he heard a thud against the boat and looking back saw someone in the water. Claimant's left foot had been struck, which caused a fracture of several small bones and the laceration of tendons.

\* \* \* \* \* \*

After reading the testimony, we have come to the conclusion that it could have been found that there was fault or negligence on the part of the operator of the boat in that he failed to use ordinary care and prudence in ascertaining the presence of [Claimant]. It was daylight, with nothing to obstruct his vision, and it is no excuse that he looked and did not see what was before him and plainly visible. Of course, he could not see the claimant after the latter dived under the water, but it is reasonably inferable that he previously had ample opportunity to so do.

*Rautbord,* 190 F.2d at 536–38.

Under this line of cases applying general seamanship principles, Defendant had a duty to maintain a proper lookout.

### b. The duty to maintain a look-out under statutory navigational rules

In 1980, Congress enacted the Inland Navigational Rules, 33 U.S.C.A. §§ 2001–2073 (West 1986), which codified many of the principles of good seamanship. Rule 5 of the Inland Navigational Rules provides:

#### Look-out (Rule 5)

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 U.S.C.A. § 2005 (West 1986).

The Senate Report, recommending passage of the Inland Navigational Rules Act of 1980, in discussing the intent and purpose of the look-out rule, stated:

This rule, regarding lookouts, ... in effect perpetuates one of the requirements of the existing good seamanship rule. Keeping a proper lookout is often termed the first rule of seamanship. Accordingly, it is appropriate that the first operating rule should be dedicated to the duty of lookout. Whoever is keeping a lookout must be able to give proper attention to that task and should not be assigned or undertake duties that would interfere with this function. On vessels where there is an unobstructed all-

around view provided at the steering station, as on certain pleasure craft, fishing boats, and towing vessels, or where there is no impairment of night vision or other impediment to keeping a proper lookout, the watch officer or helmsman may safely serve as the lookout. However, it is expected that this practice will only be followed after the situation has been carefully assessed on each occasion, and it has been clearly established that [it] is prudent to do so. Full account shall be taken of all relevant factors, including but not limited to the state of the weather, conditions of visibility, traffic density, and proximity of navigational hazards. It is not the intent of these rules to require additional personnel forward, if none is required to enhance safety.

S.Rep. No. 979, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Admin.News 7068.

In determining whether the statutory lookout rule is applicable in the case at hand, this Court must consider whether a vessel's collision with a swimmer is an accident sought to be averted by the Inland Navigational Rules. The legislative history provides that the purpose of the Act is to prevent "ship collisions." S.Rep. No. 979, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Admin.News 7068. The Senate Report, however, is unclear as to whether "ship collisions" refers only to collisions between boats or whether it includes wrecks between boats and swimmers.

At least one court has taken the position that this phrase refers to collisions with other physical objects and not merely other vessels. In *McAllister Bros. v. United States*, 709 F.Supp. 1237 (S.D.N.Y.), *aff'd*, 890 F.2d 582 (2d Cir.1989), the court held that a barge's failure to maintain a proper lookout caused its grounding on a river reef and thus violated 33 U.S.C. § 2005. However, in *Lyon v. Ranger III*, 858 F.2d 22 (1st Cir.1988), a case in which a whale-watch ship failed to see and thus struck a diver, the court of appeals approved of the district court's decision to find ordinary negligence for the ship's failure to maintain a look-out, but no statutory negligence under 33 U.S.C.

§ 2005. "The fact that the court found there was no 'per se' or 'statutory' negligence likely reflects no more than its view that the particular statutes at issue seek to prevent collisions among vessels, not collisions with divers." *See id.* at 29.

Furthermore, the look-out rule, as construed by the courts, is difficult to apply to a pleasure boat, such as Defendant's, which may be operated by one person, considering the many cases which hold that the duty to maintain a look-out cannot be satisfied by a vessel's operator. *See Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978) (neither the captain nor the helmsman in the pilot house can be considered a look-out within the meaning of admiralty law); *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1159–60 (2d Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979) (pilot steering a tug is not a proper lookout); *St. Philip Offshore Towing Co. v. Wisconsin Barge Lines*, 466 F.Supp. 403 (E.D.La.1979) (captain in the pilothouse alone attempting to navigate the vessel is not a proper lookout); *cf. Anthony*, 289 F.2d at 580 (rules requiring an independent look-out were laid down for large vessels whose navigators are occupied with other duties). Clearly, Congress and the courts did not intend that any person who alone operates a pontoon boat should be in violation of 33 U.S.C. § 2005. In fact, it is possible that 33 U.S.C. § 2005 was never meant to apply to accidents between swimmers and pleasure boats that can be operated by one person.

Recognizing this possibility, this Court nevertheless declines to attempt a resolution of that issue. In the case at hand, the same result can be reached applying general negligence principles or statutory principles. Therefore, this Court will analyze this case under the concepts of prudent seamanship and the statutory lookout rule, 33 U.S.C. § 2005, without deciding whether Congress intended the rule to apply in accidents between boats and swimmers.

### c. Heightened look-out duty in certain circumstances

█ The duty to maintain a proper lookout, whether statutory or customary, varies

with the circumstances of each situation. When circumstances demand unusual care in navigation, such care should be used. *United States v. Vereen*, 236 F.Supp. 1018 (D.S.C. 1965); *see Lyon v. Ranger III*, 858 F.2d 22 (1st Cir.1988). In *Lyon*, the court of appeals affirmed the district court's finding of ordinary negligence on the part of a captain of a whale-watch ship that struck a scuba diver. The appeals court, in discussing the standard of care owed by the ship captain to divers known to be sharing the same waters, quoted favorably from the lower court's opinion:

> Ranger III was operating in waters known to be favored by scuba divers because of the thermocline and lobstering activity and was operating in that area without the increased vigilance that, in the exercise of reasonable care, should have been used in relation to various aspects of the operation of the vessel, including lookout, speed and maintaining adequate clearance from a flagged diving boat in the area.

*Lyon*, 858 F.2d at 29.

■ Thus, the duty of vessel operators to maintain a proper lookout by sight and sound is enhanced if special circumstances warrant increased vigilance, but no special look-out is necessary if a vessel pilot can see everything that a bow pilot lookout could see. *See C.G. Willis, Inc. v. The Spica*, 6 F.3d 193 (4th Cir.1993).

### 2. Breach

■ In the case at hand, a number of circumstances imposed upon Defendant the duty to exercise increased vigilance in the navigation of his vessel. At the time Defendant left the beach area in his boat, there were people swimming in the water and playing on the nearby log. Further, there were a number of obstructions to Defendant's vision on his boat. These visual obstructions included the boat's railing, cushions, ladder, and fish finder. In light of these conditions, Defendant had a heightened duty to exercise caution in the operation of the boat.

■ Defendant, Mr. Goodman, and Ms. Altman testified that Defendant remained seated the entire time he operated the boat. He did not leave his seat to check in front of the boat prior to proceeding forward, nor did he ask anyone to keep a forward lookout. As the boat was backing, Defendant's entire attention was directed to the back and sides of the boat, and he did not begin concentrating in a forward direction until he was prepared to proceed forward. The video re-enactment of the accident, produced by Defendant to show the Court what was visible to Defendant as he operated his boat, shows that Plaintiff was visible while swimming in the water from the direction of the log toward the bow of Defendant's vessel if anyone had looked out for him. Thus, Defendant—knowing there were swimmers in the vicinity of his boat, knowing his view was partially obstructed, and yet failing to ask lookout assistance of his passengers—breached his duty to maintain a proper lookout by sight.

The duty to maintain a proper lookout includes the duty to keep a proper lookout by hearing as well. 33 U.S.C. § 2005. As stated in *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978):

> It is a primary rule of navigation that all moving vessels shall maintain a careful and efficient lookout. The lookout is "both eyes and ears of the ship."

*Id.* at 800.

Defendant's listening duties were also heightened because of the conditions prevailing at the time of the incident. Defendant acknowledged that, in addition to the operation of other boats, there were adults and children swimming all around the cove area, there were alcoholic beverages being consumed by most of the adults, and there were numerous radios including one on Defendant's boat that dictated a need for extra care in the operation of Defendant's boat.

Defendant was playing a radio on his boat at such a high volume that he was unable to hear the yells of Plaintiff or Mr. Goodman and stop or maneuver the vessel so as to avoid the accident. Defendant's playing of the stereo at a loud volume when traversing Lake Marion in an area in which he was aware people were swimming was not appropriate under the prevailing circumstances and conditions. 33 U.S.C. § 2005. Accord-

ingly, Defendant breached his duty to maintain a proper lookout "by hearing" as prescribed by common law and the Inland Navigational Rules.

### 3. Causation

■ Under general tort principles, a plaintiff must demonstrate that a defendant's breach of duty proximately caused the plaintiff's injury. However, a finding that a vessel has failed to maintain a proper lookout may impose upon the vessel the burden of showing by clear and convincing evidence that such failure did not contribute to the accident. As explained below, this shift of burden can occur either by application of the Fourth Circuit's decision in *Anthony v. International Paper Co.*, 289 F.2d 574 (4th Cir.1961), or by a finding that such breach of an Inland Navigational Rule constitutes statutory fault, thus invoking burden-shifting rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

#### a. Violation of the look-out duty under general seamanship principles

Prior to congressional enactment of the Inland Navigational Rules Act of 1980, the Fourth Circuit held that a defendant's failure to maintain a proper look-out imposed upon the defendant the burden of proving by clear and convincing evidence that this failure did not contribute to the cause of the injuries. *Anthony*, 289 F.2d at 581. The *Anthony* court, in discussing the rationale for placing such a burden on a defendant who has failed to maintain a proper lookout, stated:

> It has been suggested that, under Article 29 of the Inland Rules, the failure of a vessel to keep a proper lookout constitutes a violation of the Inland Rules and places the burden upon the ship under the doctrine laid down in *The Pennsylvania* to show not only that the violation did not contribute to the injury but could not have contributed thereto.

> \* \* \* \* \* \*

It has been held in a number of decisions in the Second and Fifth Circuits that

failure to have a proper lookout is a statutory fault or, in any event, is such a grave default in careful navigation as to impose upon the ship the same obligation as rests upon one which has been guilty of a statutory fault. In our view the violation of the duty, although a serious one, is not a statutory fault with the extreme consequences imposed by *The Pennsylvania* rule. The purpose of Article 29, which refers to the negligence of a vessel to keep a proper lookout, was not to make an addition to the statutory rules of navigation theretofore set out, but to make certain that compliance with those rules would not excuse the failure of the ship to comply with the other well known rules of good seamanship which exist irrespective of statute. We do not, however, minimize the duty of a vessel to have a proper lookout. On the contrary, we hold that the omission to perform this duty is so grave a default as to give rise to a strong inference that it contributed to the accident and to impose upon the vessel the heavy burden to show by clear and convincing evidence that it did not so contribute.

*Anthony*, 289 F.2d at 580–81 (citations omitted).[2]

At the time the Fourth Circuit decided *Anthony*, the Inland Navigational Rules did not contain mandatory language now set forth in 33 U.S.C. § 2005, the specific provision requiring a proper lookout, although that requirement has long been a cardinal rule of good seamanship. The previous statute cited by the *Anthony* court simply stated that "[n]othing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect ... to keep a proper lookout...." 33 U.S.C. § 221 (repealed, Pub.L. 96–591, § 8(a), Dec. 24, 1980, 94 Stat. 3435.)

#### b. Violation of the look-out duty under statutory navigational rules

■ Since the codification of the Inland Navigational Rules, a violation of the look-out rule has often been considered a statutory

---

**2.** Congress enacted the Inland Navigational Rules Act of 1980 subsequent to the Fourth Circuit's decision in *Anthony*.

fault. *See McAllister Bros., Inc. v. United States*, 709 F.Supp. 1237 (S.D.N.Y.), *aff'd*, 890 F.2d 582 (2d Cir.1989); *but see Lyon v. Ranger III*, 858 F.2d 22, 29 (1st Cir.1988). A statutory violation gives rise to the consequences imposed by the rule in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). Under *The Pennsylvania* rule, once a statutory violation has been established, the burden of proof shifts to the violating party who is then presumed at fault. To escape fault, that party must show not only that the violation did not contribute to the injury, but could not have contributed to it.

In *McAllister Bros., Inc. v. United States*, 709 F.Supp. 1237 (S.D.N.Y.), *aff'd*, 890 F.2d 582 (2d Cir.1989), the court held that a barge's failure to maintain a proper lookout caused its grounding on a river reef and stated:

> [T]he failure to have a lookout posted constituted a violation of a statutory duty, which shifts the burden to [the opposing party] to establish that this violation could not have been a cause of the grounding. See 33 U.S.C. § 2005 (1982); *Tug Ocean Prince*, 584 F.2d at 1160.

*McAllister*, 709 F.Supp. at 1252.

■ Thus, under *Anthony* or *The Pennsylvania*, this Court's finding that Defendant failed to keep a proper lookout imposes upon him the burden to show by clear and convincing evidence that his failure did not contribute to the accident with Plaintiff. Based on the video reproduction as well as other evidence of the circumstances on the day of the accident, this Court finds that Defendant has not shown that his failure to post an adequate lookout did not contribute to the accident.

■ This Court's application of the burden-shifting rules imposes a heavy burden on Defendant, but that is all it does. It does not determine Defendant's ultimate share of liability for the injury. *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir.1991). To make this determination, this Court must look to the reasonableness of Plaintiff's actions.

### c. Plaintiff's own negligence

■ It is clear that a person such as Plaintiff has the right to assume that others will act with due care and in accordance with the law. *Wilson v. Marshall*, 260 S.C. 271, 195 S.E.2d 610 (1973). However, this right does not relieve one of the duty to exercise due care for one's own safety. *Id.*

■ While Defendant's breach of his look-out duty prevents this Court from exonerating him from all blame for this accident, this Court finds that Plaintiff's negligence in swimming toward the boat in a highly intoxicated state was the more significant and direct cause of the accident. Under admiralty law, if one injured by the negligence of another contributes to his own injuries through his own negligence, the doctrine of comparative negligence applies and his recovery is reduced proportionally by the percentage by which his own negligence contributed to his injury. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). This Court finds that Plaintiff's gross intoxication prevented him from acting as an ordinarily prudent person would have acted under the circumstances. Plaintiff demonstrated reckless disregard for his own well being when he swam up to and under Defendant's boat while it was backing up and swimming farther out in the channel than any other swimmers. Therefore, Plaintiff's recovery must be reduced by the amount of his fault.[3]

■ The allocation of fault under the doctrine of comparative negligence is not required to be carried out with mathematical precision, and a rough estimate is acceptable if particular circumstances so require. *Flowers Transportation, Inc. v. M/V Peanut Hollinger*, 664 F.2d 112 (5th Cir.1981). This Court finds that Plaintiff's own negligence

---

**3.** Plaintiffs summarily dismiss the issue of Plaintiff's negligence by stating: "Defendant has asserted contributory negligence as a defense or bar in this matter. The law is well-settled that contributory negligence is not a defense in maritime tort cases based in negligence and pursued under the admiralty and maritime jurisdiction of the federal courts." This Court notes that Defendant asserted the doctrine of *comparative* negligence, which is not only viable in admiralty jurisdiction, but particularly applicable in this case.

contributed to his injuries in the amount of 75 percent.

### 4. Damages

■ The elements of damages which are properly considered in determining the amount of personal injury damages Plaintiff is entitled to recover include past and future medical expenses, past and future pain and suffering, past and future loss of income and earning power, disfigurement, loss of enjoyment of life, and loss of family services. *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 136 S.E.2d 286 (1964). The testimony in this case establishes Plaintiff's entitlement to recover for all of the above elements. While this Court realizes there is no exact measurement for pain and suffering, loss of enjoyment of life, and impairment of earning capacity, the Court is also aware that mathematical precision in ascertaining damages is not required. *Brooks v. United States*, 273 F.Supp. 619 (D.S.C.1967).

■ This Court finds that Plaintiff is entitled to recover $50,000.00 for past pain and suffering and $50,000.00 for future pain and suffering. He was hospitalized the first time for 15 days as a result of severe lacerations from his right shoulder to his left foot. He was released home with numerous open wounds that had to be cleaned and dressed daily. He is left with a mangled leg and foot that hurt and swell every day.

■ In addition, Plaintiff is entitled to recover for scarring and disfigurement. Plaintiff is entitled to $15,000.00 for such damages.

■ As for loss of enjoyment of life, Plaintiff no longer engages in the recreational activities he enjoyed so much before, including playing with his two young children. I find that Plaintiff is entitled to $20,000.00 for this loss.

■ Further, Plaintiffs have also testified that Kevin Schumacher is no longer able to perform certain household tasks, and as such, have demonstrated a loss of family services. Therefore, Plaintiff is entitled to $63,867.00 for this loss.

### B. Defendant's Liability to Plaintiff Toni Schumacher

■ Plaintiff Toni Schumacher, Kevin's wife, seeks to recover a sum of money that will reasonably compensate her for loss of consortium. Consortium involves the love and affection, the companionship and society, the comfort, aid, advice, and solace, the rendering of material services, and any other elements that normally arise in a close, intimate, and harmonious marriage relationship. *Ozzello v. Peterson Builders, Inc.*, 743 F.Supp. 1302, 1315 (E.D.Wis.1990). Defendant contends that a loss of consortium claim cannot be brought in admiralty after the Supreme Court's decision in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). This Court disagrees.

In *Miles*, the Supreme Court denied loss of society damages to the parents of a seaman who had been stabbed to death on a vessel. The decision turned on a finding that the Jones Act, 46 U.S.C.App. § 688, and the Death on the High Seas Act (DOHSA), 46 U.S.C.App. § 761 *et seq.*, which govern wrongful death actions for seamen and anyone killed on the high seas, respectively, foreclose recovery for non-pecuniary losses in such actions. The *Miles* Court quoted the earlier *Higginbotham* case for the proposition that, once Congress directly address the question of damages as it did in the DOHSA, courts may not " 'supplement' Congress' answer so thoroughly that the Act becomes meaningless.... [I]n an 'area covered by the statute, it would be no more appropriate to prescribe a different measure of damages than to prescribe a different statute of limitations, or a different class of beneficiaries.' " *Miles*, 498 U.S. at 31, 111 S.Ct. at 325, quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978). Then, for reasons of uniformity, the *Miles* Court concluded that an action based on the wrongful death of a seaman is limited to pecuniary losses whether brought under the DOHSA, the Jones Act, or the general maritime law. *Miles*, 498 U.S. at 33, 111 S.Ct. at 326.

Unlike the factual situation in *Miles*, the matter before this Court has not been statutorily addressed by Congress. This personal injury negligence claim by a non-seaman

does not come under the almost strict liability protection afforded by the Jones Act to seamen or by DOHSA to anyone killed on the high seas. Since Plaintiff is not entitled to the benefits offered by these various statutory enactments, it follows that Plaintiff is not restricted by the limitations on damages that were clarified in *Miles*.

Having determined that *Miles* does not dictate the answer to whether Toni Schumacher may recover for loss of consortium, this Court is still left to determine whether such a cause of action exists in an admiralty case such as the one at hand. In researching the same issue, an Illinois District Court recently wrote that it had "uncovered a labyrinth of factual scenarios and legal theories from various courts yielding different results on whether loss of society claims may be brought under admiralty law." *Emery v. Rock Island Boat Works, Inc.*, 847 F.Supp. 114, 116 (C.D.Ill.1994). In 1980, the Supreme Court allowed loss of society damages to a spouse of an injured longshoreman in a personal injury action brought under general maritime law in territorial waters in *American Export Lines v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980). Furthermore, in 1987, the district in which this Court sits allowed a loss of consortium claim by the spouse of a maritime worker who sued under the Longshore and Harbor Workers' Compensation Act (LHWCA) in *Bates v. Merritt Seafood, Inc.*, 663 F.Supp. 915 (D.S.C.1987). However, subsequent to the decision in *Miles*, a number of courts have denied nonpecuniary damages, even in cases not governed by statute and thus not subject to *Miles*, for the sake of maintaining uniformity in admiralty actions. *See, e.g., Shield v. Bayliner Marine Corp.*, 822 F.Supp. 81 (D.C.Conn.1993) (loss of enjoyment of life not recoverable in action brought by representative of victim killed in pleasure boating accident in territorial waters under general maritime law).

Following the lead blazed by *Emery v. Rock Island Boat Works, Inc.*, 847 F.Supp. 114, 116 (C.D.Ill.1994), this Court concludes that loss of consortium damages should be permitted in a personal injury negligence action under general maritime law. Accordingly, Defendant's motion to dismiss Plaintiff Toni Schumacher's loss of consortium claim is denied, and this claim will now be considered.

 Plaintiff Toni Schumacher is entitled to recover for her loss of consortium as a result of the injuries caused to her husband. She is entitled to recover damages for the loss of comfort, companionship, and society of her husband from the date of the accident, July 4, 1991 for the remainder of her husband's life. Toni Schumacher was forced to care for her husband as a nurse. She has been since the incident and continues to be without her husband's physical assistance or support. She has lost the ability to enjoy recreational activities they had formerly engaged in and is entitled to recover for the change in their relationship and lifestyle. I find that Toni Schumacher has suffered a substantial loss as a result of Kevin's injuries, and I find that an amount of $50,000.00 should be awarded for her pre-trial loss and $25,000.00 for her post-trial loss.

## IV. CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, judgment shall be entered on behalf of Plaintiff Kevin Schumacher as follows:

| | | |
|---|---|---|
| a) | Financial Loss | |
| | *Before-trial lost wages* | $ 5,720.00 |
| | *Lost earning capacity* | *$236,328.00* |
| | Total | $242,048.00 |
| b) | Medical Expenses | $ 62,371.50 |
| c) | Pain and suffering | $100,000.00 |
| d) | Scarring and disfigurement | $ 15,000.00 |
| e) | Loss of enjoyment of life | $ 20,000.00 |
| f) | Loss of family services | $ 63,867.00 |

| | |
|---|---|
| *Kevin Schumacher Subtotal* | *$503,286.50* |
| *Reduced by 75% comparative fault* | *× .25* |
| **Total Judgment for Kevin Schumacher** | **$125,821.62** |

■ Judgment shall be entered on behalf of Plaintiff Toni Schumacher as follows:

a) Loss of consortium ....................... $ 75,000.00

*Toni Schumacher Subtotal* . .......................... $ 75,000.00
*Reduced by 75% comparative fault*[4] ............ × .25
**Total Judgment for Toni Schumacher** ....... **$ 18,750.00**

---

Accordingly, it is

■ **ORDERED** that judgment be entered for Kevin Schumacher against James D. Cooper, III in the sum of one hundred twenty five thousand eight hundred twenty one dollars and sixty two cents ($125,821.62) plus prejudgment interest at the applicable market rate[5] from July 4, 1991 to the date of this Order and postjudgment interest at the legal rate from the date of the Order.

It is further

**ORDERED** that judgment be entered for Toni Schumacher against James D. Cooper, III in the sum of eighteen thousand seven fifty dollars ($18,750.00) plus prejudgment interest at the applicable market rate from July 4, 1991 to the date of this Order and postjudgment interest at the legal rate from the date of the Order.

**AND IT IS SO ORDERED.**

---

4. Toni Schumacher's recovery is properly reduced by the percentage of her husband's negligence. *See Simeon v. T. Smith & Son, Inc.,* 852 F.2d 1421, 1434 (5th Cir.1988), *cert. denied sub nom. Lumar Marine, Inc. v. Simeon,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

5. District courts are not bound by state statutory rates in setting prejudgment interest in admiralty cases and indeed have been urged to follow the interest rate prevailing commercially. *Ameejee Valleejee & Sons v. M/V Victoria U.,* 661 F.2d 310 (4th Cir.1981); *see Joye v. Heuer,* 813 F.Supp. 1171, 1175 (D.S.C.1993).