**Travis R. HOLT and Tiffany Larivere Holt, Plaintiffs,**

v.

**Scott W. BROWN, Defendant.**

**C.A. No.: 2:14-cv-1823-PMD**

United States District Court,
D. South Carolina, Charleston Division.

Signed 05/05/2016

Boyce Allen Clardy, Jr., Clardy Law Firm, Greenville, SC, S. Scott Bluestein, Bluestein Law Firm, Charleston, SC, for Plaintiffs.

Joseph R. Weston, Weston Law Firm, Mt. Pleasant, SC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATRICK MICHAEL DUFFY, United States District Judge

Plaintiffs Travis and Tiffany Holt brought this admiralty action against Defendant Scott Brown pursuant to Federal Rule of Civil Procedure 9(h). The Holts are suing Brown for personal injuries and other damages they sustained as a result of a boating accident involving the Holts, Brown, and one other person.

The Court tried this case without a jury on January 11 and 12, 2016. Having considered the testimony and the exhibits admitted at trial, as well as the parties' pre-trial briefs and post-trial proposed findings and conclusions, the Court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT [1]

1. This case arises out of a recreational cruise that came to a jarring end when a bay boat carrying four friends ran into a dock on the night of July 5, 2013.

2. At the time of the incident, Travis Holt was a thirty-three year-old firefighter and reservist in the military who had previously been deployed twice. He worked out on a regular basis and participated in physical endurance challenges and foot races. He had no physical impairments.

3. Tiffany Holt is Travis's wife. They were not married at the time of the incident.

4. The Holts were friends with Brown and with his then-girlfriend, Jennifer Belshe.

5. In July 2013, Brown invited the Holts to spend several days at Brown's father's house on Sullivan's Island, South Carolina. The Holts accepted the invitation. On July 5, 2013, the Holts, Brown, and Belshe travelled from the South Carolina Upstate to Sullivan's Island.

6. The vessel involved in this case was a nineteen-foot center-console bay boat. Brown's father kept the Boat on a lift in the Intracoastal Waterway behind the Sullivan's Island house.

7. At the time of the incident, Brown was forty-four years old. He had operated boats nearly all his life and was very familiar with the portion of the Intracoastal Waterway that runs along Sullivan's Island and the adjacent Isle of Palms. He also

1. These findings are based on the preponderance of the evidence presented to this Court.

had ample experience operating the Boat in that portion of the Waterway.

8. On the afternoon of July 5, the Holts, Brown, and Belshe boarded the Boat to cruise the nearby areas. Brown had his father's permission to use the Boat.

9. Brown handled all the preparations for the cruise. He removed the Boat's cover, checked its fuel supply, lowered it into the water, started its motor, and navigated it off of the lift.

10. Brown first navigated the Boat down the Waterway and into Charleston harbor, where the group cruised for some time. Brown handled all the steering and other operational tasks of navigating the Boat. He then headed over to Shem Creek in Mount Pleasant, where he docked the Boat by himself. This leg of the cruise occurred without incident.

11. The Holts, Brown, and Belsche then had dinner at a restaurant on Shem Creek.

12. After dinner, the four friends boarded the Boat again. Brown undocked the Boat and navigated it back to the dock at his father's house. Brown docked the Boat, and he and Travis Holt briefly went to the house to get jackets for Tiffany Holt and Belshe.

13. When Brown and Travis Holt returned to the Boat, Brown again undocked it and navigated it into the Waterway. He headed up the Waterway toward the Isle of Palms, giving his passengers a tour as they cruised.

14. They eventually reached the Isle of Palms Marina. Brown docked the Boat at the marina, and then he and the others went to a nearby restaurant to listen to some live music. This leg of the trip occurred without incident.

15. By the time they left the restaurant, it was well after nightfall. Agreeing it was time to go back to the house on Sullivan's Island, they returned to the Boat. Once more, Brown started the Boat and undocked it. He navigated away from the marina and into the Waterway, heading toward Sullivan's Island.

16. The section of the Waterway on which Brown and his passengers were travelling that night runs between the Isle of Palms, to port, and Goat Island, to starboard. Dozens of docks line both sides of the Waterway; many extend nearly to the borders of the navigational channel. That night, some of the docks from the Isle of Palms were illuminated by lights on the docks. In contrast, most of the docks on the other side of the Waterway were unlit, and the few houses on sparsely populated Goat Island offered little light for that side of the Waterway.

17. The Boat was equipped for the use of a GPS and depth-finding device, but on the day of the incident, Brown elected to leave the device at his father's house. Additionally, Brown did not bring any spotlights or flashlights aboard for the cruise.

18. Brown began the cruise home by navigating the Boat through a no-wake zone near the marina. Once he was out of the zone, he increased the Boat's speed to get the Boat running on plane.

19. Brown then invited Travis Holt to steer the Boat. Travis had limited watercraft experience on lakes and no experience with navigating in tidal waters. Brown assured him that he would help Travis steer the Boat and provide instructions, and that nothing bad would happen. Travis accepted, took a seat behind the steering wheel, and began steering. Brown stood to Travis's immediate left.

20. As Travis Holt was behind the steering wheel, Brown told him not to touch the throttle. Brown instructed Travis on where to turn the wheel and where to head the Boat. Belshe also provided Travis instruc-

tions on how to steer the vessel. Travis followed all instructions.

21. After a while, a johnboat approached the Boat from the opposite direction. Travis Holt became nervous about colliding with it. Brown and Belshe both instructed Travis turn the steering wheel to the right so as to avoid the other boat.

22. The parties disagree over who was steering the Boat from that moment forward. According to Travis Holt, Brown returned to the steering wheel to complete the turn away from the oncoming johnboat. A short time later, Travis looked out ahead of the Boat, saw an unlit dock on Goat Island just ahead, and yelled.

23. According to Brown, however, Travis continued to steer the Boat and Brown continued to stand beside him. Brown testified he then turned around to pick up an item that had blown onto the deck behind him. When he turned back towards the bow of the Boat, Brown saw the dock immediately in front of the bow.

24. Regardless of who was steering, it is undisputed that the Boat crashed into the dock. The allision occurred with sufficient force to cause extensive damage to the dock and to the Boat. All four occupants of the Boat were injured; Travis Holt and Brown were knocked unconscious.

25. Tiffany Holt and Belshe called 911 from their cell phones. They flagged down a nearby boat, whose occupants towed the Boat to a dock on the Isle of Palms where, by that time, emergency medical personnel had arrived.

26. Emergency medical technicians transported Travis Holt and Brown, via ambulance, to a nearby emergency room at the Medical University of South Car-

olina. Upon arrival, Travis was admitted to the hospital's intensive care unit. He was found to have intracranial bleeds, two cervical spine fractures, a scalp laceration, and numerous contusions. He underwent multiple CT exams to monitor the status of the intracranial bleeds. X-rays confirmed factures in two of his cervical vertebrae. Staples were placed in his scalp to close the laceration. While at MUSC, Travis consulted with a neurosurgeon for a traumatic brain injury and cervical-spine fractures.

27. Travis Holt was discharged from the hospital on July 8, 2013. He and Tiffany Holt then returned to the Upstate. Referrals were made for Travis Holt to follow up with a neurosurgeon and speech therapist.

28. After the incident, Travis Holt began experiencing headaches, nausea, dizziness, pain and decreased range of motion in his neck, and pain in his arms and hands.

29. Travis Holt later returned to MUSC for a follow-up appointment and some additional treatment. He also sought treatment and care with chiropractor Dr. Gary Tyas and Dr. Alan Peabody, of Millstone Healthcare Associates. Dr. Tyas, a chiropractor, and Dr. Peabody, a general practitioner, treated Travis several times for neck stiffness and pain in his neck, arms, and hands.

30. Travis Holt testified he still regularly has headaches and neck pain. He is under the care of another chiropractor, and has monthly massages.

31. By the time of trial, Travis Holt had incurred the following expenses to treat his injuries:

| | | |
|---|---|---|
| a. | Charleston County EMS: | $544.00 |
| b. | Millstone Healthcare Associates, PA: | $1,330.00 |
| c. | Medical University Hospital Authority: | $28,987.03 |
| d. | MUSC Physicians: | $6,432.00[2] |
| e. | Adjust to Life Chiropractic: | $3,490.00 |
| f. | Massage Envy: | $1,416.00 |

[**Editor's Note:** The preceding image contains the reference for footnote [2]

These expenses total $42,199.03.

32. Dr. Steven Poletti, of the Southeastern Spine Institute, examined Travis Holt in April 2015. Dr. Poletti opined that Travis has a sixteen percent impairment to the whole person due to the neck fractures sustained in the July 2013 boating incident. Additionally, Dr. Poletti opined that Travis is at risk for increased and/or advanced degenerative changes in his cervical spine, which would not have developed but for the neck fractures as a result of the incident. Lastly, in a deposition, Dr. Poletti testified regarding various treatments that Travis is likely to need in the future.

33. Under South Carolina Code section 19–1–150, Travis Holt's remaining life expectancy is 43.05 years.

34. At trial, Ms. Cheryl P. Mathis, a Certified Nurse Life Care Planner, testified for the Holts on the subject of Travis Holt's anticipated future medical expenses. Without objection, the Court recognized her as an expert witness in life care planning.

35. Before trial, Ms. Mathis interviewed Travis Holt and reviewed some of Travis's medical records, the transcript of Dr. Poletti's deposition, and various life care planning resources. She then prepared a life care plan that sets forth the medical care she believes Travis will likely require over his remaining lifetime. The plan lists a variety of treatments, such as physical therapy and medication, and states the anticipated present-value cost of each proposed treatment. The plan projects Travis's future medical costs will range from $222,935.00 to $269,672.00. At trial, a copy of that cost projection was admitted into evidence, and Ms. Mathis testified regarding that projection.

36. At trial, Ms. Mathis also testified that she had developed an alternate life care plan that was based solely on treatments Dr. Poletti identified in his deposition. The Court was not provided a copy of this alternate plan, and Ms. Mathis did not explicitly identify all of its proposed treatments. However, her testimony indicated that the alternate plan differed somewhat from the written plan discussed above. Ms. Mathis testified the projected present-value cost of the alternate plan ranges from $241,198.00 to $265,610.00.

37. Travis Holt testified his injuries have reduced his ability to enjoy exercise and

2. The Holts claim their charges from MUSC Physicians total $6,512.00. However, the invoices submitted as proof of those charges show a total of only $6,432.00.

other aspects of life. He continues to have pain and limited range of motion in his neck, headaches, and radicular and tingling symptoms in his arms and hands. He testified that his physical limitations upset him.

38. Travis Holt was scheduled to be deployed to Afghanistan about a week after the incident. However, due to his injuries, he was never deployed. This, too, deeply upset Travis; he felt like he let down his fellow soldiers by not being able to go to Afghanistan.

39. Travis Holt's military pay would have increased during his deployment. Not being deployed caused him a wage loss of $14,244.79.

40. On the night of the incident, Tiffany Holt experienced pain in one of her shoulders but did not receive treatment. However, later in July 2013, she underwent two medical examinations for pain in her shoulder and neck. Her medical bills for those examinations total $1,110.00.

41. Tiffany Holt has continuing pain in her right shoulder when she performs activities involving overhead motions.

42. At trial, Captain John E. Cameron testified as the Holts' liability expert on matters of prudent vessel navigation. Captain Cameron has extensive knowledge about the safe operation of vessels. He obtained that knowledge from his many years of operating vessels, his service as the U.S. Coast Guard Captain of the Port and Sector Commander for the Port of Charleston and as Chief of the Marine Safety of Operations Division of the U.S. Coast Guard for the Port of New York, and his education at the U.S. Coast Guard Academy. The Court finds Captain Cameron's testimony to be credible and highly probative on the issues of duty, breach, and comparative fault.

43. Captain Cameron testified, and the Court finds, that during the entire outing, Brown was the sole person in charge of the Boat's operation and was responsible for the safety of the Holts and Belshe, who were his passengers.

44. Captain Cameron further testified, and the Court finds, that it did not matter if Travis Holt was steering the vessel at the time of the incident, because Brown was the person in charge. As Captain Cameron testified, prudent seamanship practices required Brown, as the person in charge, to make sure the vessel was safely being operated at all times no matter who was steering the vessel.

## LEGAL CONCLUSIONS

### A. Jurisdiction and Applicable Law

The portion of the Intracoastal Waterway where the incident occurred constitutes navigable waters of the United States. Accordingly, the Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1333. *See Sisson v. Ruby*, 497 U.S. 358, 364–65, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990).

■ Cases involving a tort committed on navigable waters are governed by federal admiralty law. *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir.1981) (citation omitted). However, if there is no admiralty rule for a particular issue, the court looks to state law to supply the rule of decision. *Id.* "This rule is especially true in negligence causes of action," *Schumacher v. Cooper*, 850 F.Supp. 438, 447 (D.S.C.1994) (citation omitted), which is the cause of action the Holts assert.

### B. Brown's Fault [3]

■ To establish their claim, the Holts must prove that Brown's negligent opera-

---

3. Originally, the Holts also sued Brown's fa- ther. At trial, however, they dismissed their

tion of the Boat harmed them. The elements of negligence are duty, breach of that duty, proximate cause, and resulting injury. *Schumacher*, 850 F.Supp. at 447 (citing *Shipes v. Piggly Wiggly St. Andrews, Inc.*, 269 S.C. 479, 238 S.E.2d 167, 168 (1977)).

### 1. Duty

 It is well-established in general maritime law that a vessel operator has a duty to exercise reasonable care for the safety of his passengers. *E.g., Bubla v. Bradshaw*, 795 F.2d 349, 353 (4th Cir.1986) (quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959)). He also "has a duty to maintain a proper lookout by sight and by hearing" while the boat is travelling through navigable waters. *Schumacher*, 850 F.Supp. at 447. "This duty stems from general concepts of prudent seamanship as well as from the [regulations] governing the navigation of vessels." *Id.* As a matter of prudent seamanship, "the performance of lookout duty is an inexorable requirement of prudent navigation." *Anthony v. Int'l Paper Co.*, 289 F.2d 574, 580 (4th Cir.1961). As for regulations, Rule 5 of the Inland Navigation Rules states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. Rule 5 perpetuates the common-law duty discussed in *Anthony. Schumacher*, 850 F.Supp. at 448 (citation omitted). It imposes a duty of proper lookout upon the operator of a pleasure craft such as the Boat in this case. *See Todd v. Schneider*, No. 2:01–cv–2126–18, 2003 WL 23514560, at *11 (D.S.C. Dec. 8, 2003). Rule 5 "must be followed precise-

ly." *Id.* Importantly, "[w]hoever is keeping a lookout must be able to give proper attention to that task and should not ... undertake duties that would interfere with this function." *Schumacher*, 850 F.Supp. at 448 (citation omitted).

 "The duty to maintain a proper look-out, whether regulatory or customary, varies with the circumstances of each situation. When circumstances demand unusual care in navigation, such care should be used." *Schumacher*, 850 F.Supp. at 449–50 (citing *United States v. Vereen*, 236 F.Supp. 1018, 1020 (E.D.S.C.1965)). That higher level of care was required here. The parties were travelling at night along a watercourse lined by dozens of docks that nearly abut the outer boundaries of the navigational channel. Many of those docks, including the one the Boat struck, were unlit. *Cf. Todd*, 2003 WL 23514560, at *12–13 (finding geographic obstructions required defendant to "exercise increased vigilance").

Brown was the captain of the Boat and was in control of its operation at all times. The other three occupants were all his passengers. At no point on July 5 did Holt assign any of his passengers the task of acting as the lookout or helping him maintain a lookout. Thus, Brown alone owed the Holts a duty to maintain a proper lookout at all times during the Boat's night cruise.

### 2. Breach

 While Travis Holt was seated at the center console to steer, Brown stood immediately to his left, next to the console. From that vantage point, Brown could keep a lookout. Brown testified, however, that shortly before the allision, he left that post and turned around to pick up an item

claims against him.

that had fallen onto the deck behind him.[4] According to Brown, the Boat was not headed toward the dock when he turned around. However, by the time he finished retrieving the item and looked forward again, the dock "was there in [his] face." By leaving his vantage point at the console, Brown was not "at all times" keeping a lookout. Rather, he undertook another task that interfered with his lookout activities. That is precisely what the lookout duty prohibits.

Brown does not know how long he spent facing the Boat's stern. Although he likely looked away for only a few seconds, under the circumstances, it was unreasonable for him to do so for even such a short period of time. The Boat was travelling in the dark through waters with which he alone was sufficiently familiar. The waterway was lined with docks on either side that extended so far into the water that an allision would be likely if the Boat strayed even slightly outside the navigational channel's boundaries. With three other people aboard, Brown easily could have asked someone else to grab the loose item on the deck. Alternatively, he could have instructed one or more of them to keep a lookout while he tended to the item. By doing neither, he was negligent.

Even when Brown was standing at the console, he was not using all available means appropriate to keep a proper lookout. The Boat was equipped for use of a GPS and depth-finding device, but Brown testified he elected not to use it. Moreover, the Boat's owner's manual recommended carrying a flashlight on board during voyages. Captain Cameron testified that flashlights and spotlights are useful aids for persons performing lookout duties at night. Specifically, Brown could have used those lights to illuminate a nearby reflective channel marker in the Waterway that, if seen, would have alerted him that the Boat was heading outside the channel. Brown did not bring either type of light aboard the Boat. Finally, Brown testified he does not remember paying attention for oncoming hazards while Travis was at the wheel. These omissions constitute a breach of Rule 5, the common-law lookout duty, and the general duty of due care.[5]

### 3. Causation

Generally, plaintiffs asserting negligence must demonstrate that the defendant's breach of duty proximately caused their injuries. *Schumacher*, 850 F.Supp. at 451. However, a finding that the defendant breached his duty to maintain a proper lookout imposes upon him the burden of showing by clear and convincing evidence that such failure did not contribute to the accident. *Id.* This shift of burden occurs regardless of whether the breach is viewed as a violation of Rule 5 or as breach of the common-law lookout duty. *Id.*

This Court's determination that Brown breached his duty to keep a proper lookout imposes upon him the burden to show by clear and convincing evidence that his failure did not contribute to the allision. The record here cannot support such a conclusion. The Court concludes that Brown's negligence caused the allision and, therefore, the Holts' resulting injuries.

---

4. The Court recognizes that Brown and the Holts vigorously dispute who was behind the Boat's wheel just before the allision. However, even under Brown's version of the facts, Brown breached his duties. Accordingly, the Court assumes, without deciding, that Brown's version is accurate.

5. The parties dispute whether Brown also violated other Inland Navigation Rules or other common-law principles of prudent seamanship. In light of the above conclusion, the Court declines to decide those issues.

## C. Travis Holt's Fault

■ As an affirmative defense, Brown asserts that the Holts' recovery should be reduced because Travis Holt shares some fault for the allision. In admiralty cases, "damages should 'be allocated among the parties proportionately to the comparative degree of their fault.'" *Gehlken v. McAllister Towing & Transp. Co.*, No. 2:03–cv–3935–DCN, 2007 WL 2332487, at *10 (D.S.C. Jan. 29, 2007) (quoting *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975)). Thus, the Court must consider whether Travis failed to fulfill their "duty to exercise due care for one's own safety." *Schumacher*, 850 F.Supp. at 452 (citing *Wilson v. Marshall*, 260 S.C. 271, 195 S.E.2d 610, 612 (1973)).

■ Brown argues that because Travis Holt was steering the Boat in the time leading up to the allision, he had his own duty to comply with the Inland Navigation Rules. This argument focuses the Court's attention on what the parties view as a crucial issue: who was behind the steering wheel when the Boat hit the dock? The Holts claim it was Brown, and Brown claims it was Travis. Evidence in the record supports both positions, but the Court finds it unnecessary to make a factual finding on that point. Even if Travis had his hands on the steering wheel before the allision, he was never in control of the Boat. Rather, as Captain Cameron testified, the question of whether a person is in control, and thus has a responsibility to comply with the Rules, has "far far more to it than merely . . . who has his hand on the steering wheel." Before Brown stepped away from the wheel, he assured Travis that he would stand next to Travis and provide guidance. Brown kept that promise when Travis stepped behind the wheel.

Brown told Travis not to touch the throttle, and he directed Travis on where and how to steer the Boat. Travis was never given permission to decide where to head or how fast to go, and he was not instructed to identify potential hazards. In other words, Brown never allowed Travis to do anything other than turn the steering wheel in the precise manner that Brown directed. This mechanical, highly limited assignment fell far short of transforming Travis from a passenger to an operator, to whom the Rules would apply. The Court holds that Travis had no obligation to comply with the Inland Navigation Rules. Rather, at all times, that obligation remained solely with Brown.

Moreover, the Court sees no basis for concluding that Travis Holt breached any common-law duty of care. He was simply following Brown's instructions on how to perform the mechanical task of turning a wheel. Directing the Boat's course was a matter of prudent seamanship and risk assessment that remained Brown's responsibility. Brown's judgment on where to steer, of course, could be properly informed only if Brown maintained a proper lookout, which he failed to do. Thus, the correct apportionment of fault among the Holts and Brown is that Brown is 100% at fault.[6]

## D. Damages

■ In a personal injury case such as this, the elements of damages potentially recoverable "include past and future medical expenses, past and future pain and suffering, past and future loss of income and earning power, disfigurement, loss of enjoyment of life, and loss of family services." *Schumacher*, 850 F.Supp. at 453 (citing *Watson v. Wilkinson Trucking Co.*,

---

**6.** To be thorough, the Court has considered whether any fault should be apportioned to Tiffany Holt. The Court sees no basis in the record for doing so.

244 S.C. 217, 136 S.E.2d 286, 291 (1964)). There is no exact measurement for pain and suffering, loss of enjoyment of life, and impairment of earning capacity, but mathematical precision in ascertaining damages is not required. *Brooks v. United States*, 273 F.Supp. 619, 629 (D.S.C.1967).

### 1. Travis Holt's Damages

Travis Holt seeks several types of damages. The Court addresses each type *seriatim.*

#### a. Past Medical Expenses

Travis Holt seeks to recover certain expenses for his prior medical care. At trial, he submitted into evidence invoices totaling $40,783.03 in prior care. In addition, Travis testified that for the past two years, he has been paying for $59.00 per month massages to relieve pain and tension. Over two years, that amounts to $1,416.00. Thus, he seeks a total of $42,199.03 in past care expenses.

 Most of these expenses are recoverable, as they consist of services such as emergency medical treatment, radiology, ambulance transportation, and pain management. Those expenses resulted from Brown's negligence and were reasonably necessary. *See Sossamon v. Nationwide Mut. Ins. Co.*, 243 S.C. 552, 135 S.E.2d 87, 91 (1964). Moreover, the Court is satisfied that the invoiced amounts, and the massage rate, are reasonable. *See Haselden v. Davis*, 353 S.C. 481, 579 S.E.2d 293, 295 (S.C. 2003) (citation omitted). However, the Court will not award expenses for past chiropractic treatment. Although Travis Holt testified that both the chiropractic care eases his pain and that doctors recommended it, Ms. Mathis testified that chiropractic treatment is not appropriate for Travis's spinal fractures. In light of that testimony, the Court concludes Travis has not shown it was reasonably necessary to have chiropractic care. Thus, the Court denies his request for expenses from Dr. Tyas ($720.00) and Adjust to Life Chiropractic ($3,490.00).

In sum, the Court will award Travis Holt $37,989.03 in past medical expenses.

#### b. Future Medical Expenses

 Travis Holt seeks damages to cover his anticipated future medical expenses. "[R]ecovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain." *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1160 (4th Cir.1986). "Reasonably certain" is "a consequence 'which follows the original act complained of in the usual, ordinary, and experienced course of events.'" *Rabb v. Orkin Exterminating Co.*, 677 F.Supp. 424, 426 (D.S.C. 1987) (quoting *Ford v. AAA Highway Express, Inc.*, 204 S.C. 433, 29 S.E.2d 760, 762 (S.C.1944)). "Such damages cannot be recovered if future consequences are 'mere possibilities.' Probability exists when there is more evidence in favor of a proposition than against it." *Lohrmann*, 782 F.2d at 1160. In other words, there must be "[a] greater than 50% chance that a future consequence will occur." *Id.*

After carefully analyzing the record, the Court concludes Travis Holt has established a reasonable certainty that he will incur the following recurring expenses for the rest of his life: intermittent use of a prescription NSAID ($2,238.60); intermittent use of a prescription analgesic ($1,635.90); semiannual laboratory testing ($14,637.00); annual monitoring of laboratory results ($4,090.00); and semiannual pain management appointments ($15,068.00). Travis has also established a reasonable certainty that he will need one neuropsychological evaluation ($1,500.00); one CT scan ($1,300.00); one MRI ($2,880.00); two courses of physical thera-

py, with evaluations ($5,508.00); two rhizotomies ($12,434.00); six cervical epidural steroid injections ($12,456.00); and one medial branch block ($2,899.00). The record indicates the total present reasonable value of those expenses is $76,646.50. The Court will award Travis that amount.

■ The life care plan Ms. Mathis developed for Travis Holt projects lifetime total costs ranging from $222,935.00 to $269,672.00. The per-unit costs expressed in Ms. Mathis's plan are reliable and reasonable, and thus the Court has used those figures to determine the present value of each type of treatment discussed in the preceding paragraph. The Court does not, however, adopt the plan's overall cost projections because they are based in part on unsupported assumptions that Travis will need certain treatments for the rest of his life. For example, the life care plan allocates $130,553.00 for Travis to have twenty-one rhizotomies—one every two years over the course of his life expectancy. Dr. Poletti, however, believed that only one or two rhizotomies would be needed. Thus, with the exception of the specific treatments set forth in the preceding paragraph, the Court concludes that Travis has not shown a reasonable certainty that he will incur the expenses identified in the life care plan.

As for Ms. Mathis's alternate plan, the Court declines to adopt it. For several reasons, the Court does not find it persuasive. First, Ms. Mathis testified she found Poletti's deposition confusing and was not sure how to interpret some of the statements he made in it. Second, she acknowledged that she mistakenly read Dr. Poletti as testifying he could make twenty-year treatment projection, when he actually said that was impossible. Third, her plan included a $150,000.00 surgery that, according to Dr. Poletti, Travis Holt was only 30% likely to need. Finally, with the exception of that unlikely surgery, Ms. Mathis did not state the projected costs of any particular treatments.[7] These factors prevent a conclusion that Travis is reasonably certain to incur the amount of expenses Ms. Mathis projected in her alternate plan.

Finally, Travis Holt seeks $30,479.40 [8] to get massages for the rest of his life. The Court denies that request. He has not established a reasonable likelihood that, in addition to the medical care that Ms. Mathis and Dr. Poletti outlined, such treatment will be reasonably necessary.

### c. Lost Wages

Travis Holt is entitled to recover $14,244.79 in military pay he lost due to not being deployed. See *Schumacher*, 850 F.Supp. at 453; *Sweeney v. Car/Puter Int'l Corp.*, 521 F.Supp. 276, 287 (D.S.C.1981).

### d. Pain and Suffering

The record demonstrates that Travis Holt has experienced a considerable amount of pain and suffering and that, even with medical treatment, it is reasonably certain he will continue to experience some pain for the remainder of his life. Travis seeks $300,000.00 for past and future pain and suffering. Based on the entire record, the Court concludes $200,000.00 is the appropriate amount of compensation for both past and future pain and suffering. See *Schumacher*, 850 F.Supp. at 453; *Sweeney*, 521 F.Supp. at 287–88.

7. The Holts submitted treatment-specific figures in their proposed findings of fact, but the Court cannot rely on them. The proposed findings are not evidence, and in any event, when one adds up those figures, they do not match Ms. Mathis's projection.

8. $59.00 per month, times 12 months, times 43.05 years.

### e. Mental Anguish/Permanent Emotional Scarring

In additional to physical pain and suffering damages, Travis Holt seeks $110,000.00 for the past and future emotional distress associated with his diminished activity and his feeling of letting down his fellow soldiers. The Court agrees that a separate award is appropriate, *see Sweeney*, 521 F.Supp. at 288, but disagrees as to the amount to be awarded. Based on the entire record, the Court concludes $60,000.00 is the appropriate amount of compensation.

### f. Loss of Enjoyment of Life

Next, Travis Holt seeks $110,000.00 as compensation for losing his ability to enjoy the athletic and recreational activities in which he used to participate, as well as his loss of enjoyment of other normal activities of life. Based on the entire record, the Court concludes $60,000.00 is the appropriate amount of compensation for this loss.

### 2. Tiffany Holt's Damages

The Holts have proven that Brown's negligence has caused Tiffany to incur past medical expenses and to experience past pain and suffering. The Court awards her $1,110.00 for past medical expenses and $15,000.00 for past pain and suffering.[9]

### 3. Prejudgment Interest

The Holts ask the Court to add prejudgment interest to their damages. In maritime injury cases, "the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828 (4th Cir.1992) (citation and quotation marks omitted). However, the court may decline to award prejudgment interest when it finds that "peculiar circumstances"

would make such relief inequitable. *Id.* (citation omitted). Such "peculiar circumstances" include "an unwarranted delay in bringing suit, a damages award substantially less than that sought, a genuine dispute regarding liability, complex legal and factual issues, and a bad[-]faith claim." *Id.* at 828 n. 14. Two of those circumstances are present here. There was a genuine dispute over liability and apportionment of fault. Brown and the Holts fervently disagreed as to the factual question of who steered the Boat into the dock and as to the legal consequences of the Court finding that Travis Holt was steering at the time of the allision. In addition, there is a wide disparity between the amount of damages the Holts have demanded—$892,695.22—and the amount they have established—$464,990.32. The Court finds it would be inequitable for Brown to pay prejudgment interest on the damages the Court is awarding.

### CONCLUSION

Based on the foregoing, it is **ORDERED** that judgment be entered for Travis Holt against Scott Brown in the sum of four hundred forty-eight thousand, eight hundred eighty dollars and thirty-two cents ($448,880.32) plus postjudgment interest at the legal rate from the date of this Order.

It is further **ORDERED** that judgment be entered for Tiffany Holt against Scott Brown in the sum of sixteen thousand, one hundred ten dollars and no cents ($16,110.00) plus postjudgment interest at the legal rate from the date of this Order.

**AND IT IS SO ORDERED.**

---

**9.** Tiffany Holt initially made a claim for loss of consortium, but she withdrew that claim at trial.